**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**NADIA T.,**

        **Plaintiff,**

    **v.**                       **Civil Action 3:25-cv-121**
                                      **Judge Thomas M. Rose**
                                      **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff, Nadia T., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 8) and **AFFIRM** the Commissioner's decision.

**I.     BACKGROUND**

Plaintiff first filed for benefits on March 23, 2015. Those applications were denied by administrative decision on September 27, 2017. (R. at 61–83). Relevant here, Plaintiff again applied for SSI on August 22, 2018, alleging disability beginning February 1, 2009, due to worsening of back pain, worsening of right shoulder pain, worsening of anxiety, worsening of depression, low blood pressure, hair loss and skin problems. (R. at 198–219, 229). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on October 7, 2020. (R. at 36–60). Ultimately, the ALJ denied benefits in a written decision on December 23, 2020. (R. at 12–35).

After the Appeals Council denied review, Plaintiff filed a case in the United States District Court for the Southern District of Ohio. The Court remanded the case to the Commissioner. *See [Nadia T.] v. Comm'r of Soc. Sec.*, No. 3:22–cv–00012 (S.D. Ohio March 7, 2023). (R. at 1942–54). Upon remand, ALJ Adkins held another hearing (R. at 1886–1911), and ultimately issued a decision again finding Plaintiff not disabled. (R. at 1835–85). When the Appeals Council denied review, that denial became the Commissioner's final decision. (R. at 1829–34).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on April 22, 2025 (Doc. 1), and the Commissioner filed the administrative record on June 23, 2025 (Doc. 7). The matter is ripe for consideration. (Docs. 8, 10, 11).

### A. Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's statements to the agency and the testimony from the administrative hearing as follows:

> In her application for benefits, [Plaintiff] alleged disability on the basis of worsening of back pain, worsening of right shoulder pain, worsening of anxiety, worsening of depression, low blood pressure, hair loss, and skin problems (Exhibit B1E/2). At the time she applied for benefits, [Plaintiff] was 5'5" tall and weighed 200 pounds (Exhibit B1E/2). At her 2020 hearing, [Plaintiff] testified that she began having problems with her back in 2012 (Exhibit B14B/9). Her pain had not gotten better over the past several years (Exhibit B14B/9). The pain was in her lower back, and it travels into her neck and shoulder (Exhibit B14B/9–10). She stated moving makes it worse, and her children helped her all of the time (Exhibit B14B/10). She was unable to do any chores (Exhibit B14B/10). She was generally able to take care of her personal needs, but she needed help with some clothing such as a bra or shoes (Exhibit B14B/10–11). Her doctor spoke to her about injections (Exhibit B14B/11). She was first started in physical therapy, and then the pandemic interfered with treatment (Exhibit B14B/11). When she was participating in physical therapy, it was helpful (Exhibit B14B/11). She reported headaches one to three times per week, and she sometimes had very bad ones that came out of nowhere (Exhibit B14B/12). At those times, she woke with a headache, and she was unable to hear anything (Exhibit B14B/12). She was unable to sleep or watch television during them, and she had low blood pressure during them (Exhibit B14B/12). They usually lasted about one day, and she was better after sleeping (Exhibit B14B/12). Her headaches were about the same as they had been (Exhibit B14B/12). With respect to her breathing, she still used a nebulizer,

and she used her C–PAP all night (Exhibit B14B/12). She used her nebulizer daily, and she had to use it extra when the weather changed (Exhibit B14B/12). She stated her breathing has gotten worse (Exhibit B14B/13). She noted recent trouble with her right thumb getting locked, and she had difficulty using her hand (Exhibit B14B/14). Prior to her thumb issue, she was able to lift twenty pounds, but she was now limited to about fifteen pounds because her thumb cannot hold anything (Exhibit B14B/14). She was unable to do zippers and was able to do buttons with help from her kids (Exhibit B14B/14). She was 5'5" tall and weighed 250 pounds (Exhibit B14B/9). She noted she had gained weight since 2010 due to her prednisone for her asthma (Exhibit B14B/9). She reported seeing her psychiatrist about every two weeks, if not every week, and she saw her therapist up to two times per week (Exhibit B14B/15). She noted she began hearing voices and seeing things about a year before the hearing, and it occurred once a week to once per month (Exhibit B14B/15). Her medication helped a little bit (Exhibit B14B/16). Even with medication, it took hours for her to fall asleep at night (Exhibit B14B/16). She napped about once or twice per week (Exhibit B14B/16). She noted panic attacks as frequently as daily, and she also had nightmares (Exhibit B14B/16–17). She was able to go to the pharmacy, but she left after three to four minutes because she thought people were looking at her and got nervous and scared (Exhibit B14B/17). She stated she was limited to standing for ten minutes, and she was able to walk for fifteen minutes (Exhibit B14B/17). She was able to sit for an hour before having to change position (Exhibit B14B/18). She spent an hour or two laying down (Exhibit B14B/18).

At her most recent hearing, [Plaintiff] testified that she did not go anywhere because of her pain. She rated her low back and neck pain at 7–7.5/10. Physical therapy had helped with pain. She reported she was limited to standing two to three minutes at a time, and she was limited to sitting for five minutes at a time. She noted her doctor gave her a handicapped placard for her back, and there was talk of using an assistive device, though she did not use one at that time. Her only treatment was home exercises at that time. [Plaintiff] reported she was still using her C–PAP, and she also had two inhalers. The weather made her breathing worse. [Plaintiff] reported sharp abdominal pain. She noted memory loss, stating she forgets a lot because she does not pay attention. With respect to her depression, she had some good days and some horrible days. She stated she had maybe two good days in a week. She generally did not go out in public by herself, as her son or daughter took her places, though she sometimes when places by herself. However, she had anxiety attacks and had to go back home because she was too scared and nervous. She reported crying episodes and trouble sleeping with about five hours of sleep during that time. She stated she was unable to concentrate on a thirty–minute television show. She estimated she was limited to lifting one to two pounds before her back hurt. She had to sit to put on clothing. She would not be reliable at a sit–down job because she cannot sit for a long time.

(R. at 1847–48).

3

### B. Relevant Medical Evidence and Medical Source Opinions

Discussed further below, the ALJ summarized Plaintiff's medical records and symptoms relating to her physical and mental impairments. (R. at 1848–64). Also discussed below, the ALJ summarized and evaluated the medical source opinions, including the opinions of Giovanni Bonds, Ph.D. Sayyah Ajlouni, M.D., and physical therapist Christopher Hegyi. (R. at 1867–75 (citing R. 965–73, 1344–46, 1347–49, 1350–54, 3043–50, 3051–57, 3058–73)). The ALJ additionally summarized and evaluated the prior administrative medical findings of the State agency medical and psychological consultants, Vicki Warren, Ph.D., Carl Tischler, Ph.D., Mehr Siddiqui, M.D. and Gail Mutchler, M.D. (R. at 1865–67 (citing R. at 90–109, 111–25)).

### C. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since August 22, 2018, the application date. (R. at 1842). The ALJ determined that Plaintiff suffered from the following severe impairments: degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the right thumb with trigger thumb, migraines, abdominal pain, COPD, asthma, hypertension, obstructive sleep apnea, obesity, anxiety, memory loss, agoraphobia, insomnia, depression, PTSD. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meet or medically equals a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with lifting and/or carrying twenty pounds occasionally and ten pounds frequently. She is able to stand and/or walk for about four hours and sit for about six hours in an eight–hour workday. She is limited to no climbing of ladders, ropes, or scaffolds with frequent balancing and occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. She is able to frequently handle and finger with the right upper extremity. She is able to tolerate occasional concentrated exposure to vibrations, extreme heat, extreme cold,

4

humidity, dusts, odors, fumes, and pulmonary irritants. She should avoid unprotected heights, dangerous machinery, and commercial driving. She is able to perform simple, routine tasks but not at a production–rate pace and without strict performance quotas. [Plaintiff] is limited to occasional interaction with coworkers and supervisor but no interaction with the general public. She is able to tolerate occasional changes to a routine work setting defined as one to two per week with those changes explained in advance.

(R. at 1846).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 1848).

Plaintiff has no past relevant work. (R. at 1875). Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform light exertional, unskilled jobs that exist in significant numbers in the national economy, such as a routing clerk, mail clerk, or clothing marker. (R. at 1876). He therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since August 22, 2018, the date the application was filed (20 CFR 416.920(g))." (R. at 1877).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter

differently." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff alleges the ALJ committed many errors. First, she claims the ALJ gave most of the opinions some weight without explaining which portions of the opinions were persuasive and unpersuasive. (Doc. 8 at 6). Second, and "even more disingenuously," Plaintiff says the ALJ was inexplicably less persuaded by Dr. Bonds' opinion on remand. (*Id.*). Third, Plaintiff claims the state agency reviewers failed to give a "fresh look" at the medical evidence on remand. (*Id.* at 8). Fourth, she says the ALJ improperly evaluated x-ray evidence. (*Id.* at 9). And, finally, she claims the ALJ failed to evaluate the opinion of Plaintiff's physical therapist for consistency. (*Id.* at 10). For the following reasons, the Undersigned disagrees on all fronts.

### A. Vagueness

Plaintiff begins by claiming the ALJ found "most of" the medical opinions to be "conditionally 'somewhat' or 'partially' persuasive—whatever that means." (*Id.* at 6). Plaintiff insinuates that the ALJ erred because he found many of the opinions to be "partially persuasive" or "somewhat persuasive" without detailing which aspects he credited and which ones he discounted. (*Id.* (citing *Sanders v. Comm'r of Soc. Sec.*, No. 1:13-CV-481, 2014 WL3899288, at *13 (S.D. Ohio Aug. 11, 2014); *Baskin v. Colvin*, No. 3:11-0948, 2013 WL 1149597, at *17 (M.D. Tenn. Mar. 19, 2013), *report and recommendation adopted*, No. 3:11-CV-0948, 2013 WL 1405962 (M.D. Tenn. Apr. 8, 2013)). The Undersigned disagrees.

Under current regulations, an ALJ is permitted to find opinions partially or somewhat persuasive so long as he evaluates the opinion for supportability and consistency. *Salisbury v. Comm'r of Soc. Sec.*, No. 5:23-CV-01797-DAP, 2024 WL 2894772, at *5 (N.D. Ohio Apr. 24,

2024) ("Because the ALJ addressed both supportability and consistency, he complied with the regulations in finding Dr. Elahi's opinion only somewhat persuasive"), *report and recommendation adopted*, No. 5:23-CV-1797, 2024 WL 2312819 (N.D. Ohio May 22, 2024). Moreover, when evaluating an opinion for supportability and consistency, "there is no requirement to cite to every piece of evidence or conclusion." *Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *2 (6th Cir. Nov. 22, 2022). Thus, as long as the ALJ evaluated the opinions for supportability and consistency, he was not required to categorize each of their conclusions as persuasive or unpersuasive before giving the opinion partial weight as a whole.

Although Plaintiff doesn't point to a specific opinion that the ALJ allegedly mis-evaluated, the Undersigned conducted a review and determined that the ALJ considered the supportability and consistency of each opinion he found partially or somewhat persuasive. (*See, e.g.*, R. at 1874 (finding the opinion of Mr. Hegyi to be "somewhat persuasive" because it was "only somewhat supported by and consistent with the totality of the medical evidence in the record."); R. at 1869 (finding the opinion of Plaintiff's therapist to be "partially persuasive" because it "is only somewhat supported by and consistent with the record, which demonstrates adequate mental functioning despite a need for some mental limitations.")). The Undersigned finds no error.

### B.    Dr. Giovanni Bonds

Next, Plaintiff claims the ALJ had an impermissible change of heart in evaluating the opinion of Dr. Giovanni Bonds, the agency psychological examiner. Specifically, she argues that the ALJ erred because he was less persuaded by Dr. Bonds' opinion on remand than he was in his 2020 opinion. (Doc. 8 at 6–8). The Undersigned disagrees.

Dr. Bonds completed a consultative psychological evaluation of Plaintiff in May 2019. (R. at 965–73). After examining Plaintiff, Dr. Bonds assessed her with a social anxiety disorder and a single episode of major depressive disorder with psychotic features and agoraphobia. (R. at 969).

Dr. Bonds concluded that Plaintiff would face "some difficulties" in a job that required her to work with the public or to be around many people. (R. at 970). He then claimed that Plaintiff's "emotional problems and low stress tolerance" would hamper her ability to stay on task. (*Id.*). Citing Plaintiff's anxiety, depression, and low energy, Dr. Bonds further opined that Plaintiff's "ability to handle work pressures would seem to be very limited" and she would have difficulty keeping to a schedule. (*Id.* at 971).

In the ALJ's 2020 remanded opinion, ALJ Adkins was "substantially persuaded" by Dr. Bonds' consultative examining opinion. (R. at 26). In the present decision, however, ALJ Adkins found the opinion only "somewhat persuasive." (R. at 1867 (citing R. at 965–71)). In relevant part, he claimed the record only "somewhat supported" Dr. Bonds' opinions because it demonstrated Plaintiff had better cognitive functioning than opined. (*Id.*). The ALJ then pointed to Plaintiff's mental status exams, which showed normal attention and concentration limits that never extended beyond mild impairments. (*Id.* (citing R. at 1359, 1412, 1473, 1529, 1573, 1601, 2545, 2555, 2564, 2800, 2877, 3053)). As for her memory, the ALJ said the record showed "some" reduction, but that Plaintiff's memory was "never more than moderately reduced, and it was also considered normal at times." (*Id.* (citing R. at 1412, 2545, 2555, 2564, 2800, 2877)). These findings, said the ALJ, suggested Plaintiff had "somewhat better ability than demonstrated" to understand, remember, or apply information, and to maintain concentration, persistence and pace. (*Id.*). He also said it was not indicative of "an inability to perform work consistently or keep a schedule." (*Id.*). And he declined to adopt Dr. Bonds' conclusions that said otherwise. (*Id.* (citing R. at 970, 971)).

Plaintiff nevertheless says the ALJ erred because he can't change his mind like this. (Doc. 8 at 6). For two reasons, the Undersigned is unmoved.

8

First, it is not error for the ALJ to analyze the same evidence on remand and come out differently. Once an ALJ's opinion is remanded and the Appeals Council vacates the decision, it is no longer a final decision subject to judicial review. *Halbert v. Bisignano*, No. 7:23-CV-85-REW, 2025 WL 1794434, at *3 (E.D. Ky. June 30, 2025) ("If the Appeals Council vacates and remands a decision, the decision is no longer a final decision under the Act.") (quoting *Perkins v. Comm'r of Soc. Sec.*, 739 F. Supp. 3d 546, 561 (E.D. Ky. 2024) (citation modified)). An ALJ must instead review all pertinent issues *de novo*. *See* SSA, Hearings, Appeals, and Litigation Law Manual (HALLEX), § I-2-8-18(A); *Wyatt v. Comm'r of Soc. Sec.*, No. 1:16-CV-938, 2017 WL 3224666, at *5 (S.D. Ohio July 31, 2017), *report and recommendation adopted*, No. 1:16-CV-938, 2017 WL 4349115 (S.D. Ohio Sept. 29, 2017). Here, the ALJ's 2020 opinion was remanded and vacated. (R. at 1958 ("[T]he Appeals Council vacates the final decision of the Commissioner of Social Security and remands this case.")). *Halbert*, 2025 WL 1794434, at *3. The ALJ was not required to defer to his own previous findings, and he clearly did not do so. Thus, the change in his decision is evidence that the ALJ followed the relevant regulations—not that he violated them.

Second, the ALJ's analysis is supported by substantial evidence. ALJ Adkins rejected Bonds' conclusion that Plaintiff had below average cognitive abilities and would have difficulty performing consistent work and keeping a schedule. (R. at 1867 (citing R. at 970, 971)). The ALJ said these conclusions were inconsistent with mental status exams that showed at most mild impairment with attention and concentration. (*Id.* (citing R. at 1359, 1412, 1473, 1529, 1573, 1601, 2545, 2555, 2564, 2800, 2877, 3053)). Indeed, Plaintiff consistently demonstrated normal attention limits. (*See, e.g.*, 1359). Moreover, the ALJ found the proposed limitations inconsistent with records that showed Plaintiff never had more than moderate memory issues. (*Id.* (citing R. at 1412, 2545, 2555, 2564, 2800, 2877)). This too is reflected in the record. For example, in a

2021 mental status exam, Plaintiff was found to have only a moderate memory impairment. (R. at 2545). In a 2022 exam, her memory impairment was only mild. (R. at 2555). And in the 2023 exam, she wasn't observed to have any memory problems. (R. at 2564). All this shows the ALJ's analysis was supported by substantial evidence.

In response, Plaintiff points to other parts of the record that she says compel the opposite conclusion. (Doc. 8 at 7). Specifically, she says Dr. Bonds' opinion is consistent with the opinions of other treating sources who found Plaintiff had marked limitations and would be off task 20% or more of the workday and would miss multiple days per month. (*Id.* (citing R. at 1344–49)). She also points to other medical findings that show Plaintiff experienced anxiety and nightmares. (*Id.* (citing R. at 835, 919–52, 1144–94, 1466–1650, 1606)). But Plaintiff misses the point. Even if "substantial evidence exists in the record to support a different conclusion," that is not enough to justify remand. *Killoran v. Comm'r of Soc. Sec.*, No. 2:18-CV-449, 2019 WL 4854763, at *2 (S.D. Ohio Oct. 2, 2019) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)). The Undersigned therefore finds no error.

### C. State Agency Doctors and Fresh Review

Plaintiff next critiques the ALJ's analyses of state agency reviewing psychologists Drs. Warren and Tishler, and state agency reviewing physicians, Drs. Mehr and Siddiqui. (Doc. 8 at 7–8 (citing R. at 1866–67)). More specifically, she takes issue with the fact that ALJ Adkins found these reviewers' opinions persuasive, despite saying it was unclear whether they gave a "fresh look" at the evidence. (*Id.*). For the following reasons, the Undersigned disagrees.

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997). The Sixth Circuit subsequently clarified the scope of *Drummond* in *Earley v.*

*Commissioner of Social Security* by reiterating that *res judicata* applies to administrative proceedings.  893 F.3d 929 (6th Cir. June 27, 2018).  The *Earley* Court explained that when a claimant files a later application covering the same period as an earlier application, *res judicata* applies absent good cause to revisit the earlier determination.  *Id.* at 933.  But the *Earley* Court explained that *res judicata* does not apply when a claimant files a subsequent application seeking benefits for a different period.  Instead, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review."  *Id.*  And an ALJ errs "when he considers the previous RFC a mandatory starting point for the analysis."  *Gale v. Comm'r of Soc. Sec.*, No. 1:18-CV-859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019), *report and recommendation adopted*, No. 1:18-CV-859, 2020 WL 871201 (W.D. Mich. Feb. 21, 2020).  So, the relevant question is typically whether the ALJ gave a "fresh look" at the new evidence on remand.

This Court has since extended the *Earley* "fresh look" requirement to that of reviewing doctors.  *See Parrish v. Comm'r of Soc. Sec.*, No. 3:17-CV-411, 2019 WL 4667730, at *2 (S.D. Ohio Sept. 25, 2019) ("[A]s a matter of common sense, the holding in *Earley* must be extended to those reviewing doctors.  Like the ALJ, they must take a 'fresh look' at the new and additional evidence to determine whether it supports the new application for a more recent time period.").  Nevertheless, where the ALJ finds state agency opinions to be supported and consistent with the record, the ALJ may permissibly rely on state agency opinions, even if it is unclear that the reviewers gave a "fresh look" at the evidence.  *Linda A. v. Comm'r of Soc. Sec.*, No. 3:23-CV-208, 2024 WL 242504, at *9 (S.D. Ohio Jan. 23, 2024) (finding harmless error even in event the agency reviewers did not give a fresh look because the ALJ found the opinions persuasive based on supportability and consistency, as opposed to fact that the reviewers adopted a previous RFC),

11

*report and recommendation adopted sub nom. Linda A. v. Comm'r of Soc. Sec. Admin.*, No. 3:23-CV-208, 2024 WL 4227221 (S.D. Ohio Sept. 18, 2024).

As previously explained, Plaintiff filed her first application for social security benefits in 2017. (R. at 1948). That application was reviewed by ALJ Kenyon, who addressed whether Plaintiff had a disability from February 2009 through September 27, 2017. (*Id.*). Then, Plaintiff filed another application in 2018, this time reviewed by ALJ Adkins in 2020. (R. at 1949). On this application, ALJ Adkins was required to evaluate whether Plaintiff was disabled from September 28, 2017, through December 23, 2020—a different period of time than ALJ Kenyon. (*Id.*). But the Court remanded ALJ Adkins' 2020 opinion because he and the state agency reviewers gave improper deference to ALJ Kenyon's RFC determination in violation of *Earley*. (R. at 1950). On remand, ALJ Adkins re-evaluated the opinions of all four reviewers. The Undersigned looks at each.

First, the psychologists. At the initial level, Dr. Vicki Warren, Ph.D. found that Plaintiff was limited to performing unskilled, simple, repetitive tasks with no fast-paced production work or strict performance quotas; Plaintiff could have occasional contact with coworkers and supervisors but no public contact; she was limited to performing jobs involving very little, if any, change in job duties or work routine from one day to the next. (R. at 1866). In making this finding, Dr. Warren adopted ALJ Kenyon's RFC determination because she found no significant or material changes to Plaintiff's mental-health conditions from ALJ Kenyon's final findings. (R. at 107). At the reconsideration level, Carl Tishler, Ph.D., found that the evidence supported Dr. Warren's restrictions. (R. at 122–23).

ALJ Adkins re-evaluated these findings and determined that they were "persuasive" as follows:

*** While it is not clear if they gave a "fresh look" to the evidence for the period under review, the opinions of Drs. Warren and Tishler are nevertheless well explained and generally supported by and consistent with the record, which generally reflects adequate mental functioning despite her subjective complaints (Exhibits B1F–B33F). While the record demonstrates some mood abnormalities and hallucinations, she nevertheless demonstrated good contact with reality in knowing that she was having hallucinations, which she described as manageable, as was her depression (e.g. Exhibits B21F/5, 169, 175, 251; B30F/19). Though there were some abnormalities in other areas of mental status examinations, findings were nevertheless indicative of an ability to perform work activity within the limitations opined (Exhibits B1F–B33F). Mental status examinations generally demonstrate that attention and concentration were within normal limits, and it was never more than mildly impaired (e.g. Exhibits B8F/6; B21F/9, 70, 126, 128; B18F/5; B30F/26, 35, 271, 348; B33F/3). While some records reflect "some" reduction in memory, it was never more than moderately reduced, and it was also considered normal at times (e.g. Exhibits B21F/9, 69–70, 126, 198; B30F/16, 26, 35, 271, 348). Most treatment notes reflect intelligence was average (e.g. Exhibits B21F/9; B30F/16, 26, 35). She was usually described as cooperative and pleasant with good eye contact (e.g. Exhibits B8F/6; B21F/9; B30F/16, 26, 35). With rare exceptions, most of which were related to legal troubles, [Plaintiff] generally presents with fair insight and judgment (e.g. Exhibits B8F/5; B21F/9, 70, 126, 198; B30F/16, 26, 35, 228, 293, 348). These findings support an ability to perform work activity within the limitations opined. However, some additional restrictions were adjusted for clarity, though they were done so in a way to give [Plaintiff] a more favorable residual functional capacity. Accordingly, the opinions of Drs. Warren and Tishler are persuasive.

(R. at 1866–67).

Next, the physicians. Dr. Mehr Siddiqui, M.D., reviewed Plaintiff's medical records initially in July 2019 and concluded that she could perform light work with various postural and environmental limitations. (R. at 104–06). She, too, adopted ALJ Kenyon's RFC determination. (R. at 106). At the reconsideration level in October 2019, Gail Mutchler, M.D., reached a similar conclusion about Plaintiff's abilities. (R. at 122).

In summarizing these opinions and re-evaluating their findings, ALJ Adkins found them to be "somewhat persuasive." (R. at 1865). He explained:

In finding no change in [Plaintiff]'s physical condition, Drs. Siddiqui and Mutchler adopted the prior residual functional capacity pursuant to AR 98–4(6) (Exhibits B3A and B5A). As such, Drs. Siddiqui and Mutchler opined [Plaintiff] was able

13

to perform a reduced range of light work with mostly occasional postural activities, avoiding all exposure to hazards, and avoiding concentrated exposure to extreme cold, extreme heat, humidity, and vibration (Exhibits B3A and B5A). While it is not clear if they gave a "fresh look" to the period under review, the opinions of Drs. Siddiqui and Mutchler are nevertheless explained with citations to the record and are generally supported by and consistent with the record, which demonstrates adequate physical functioning despite her subjective complaints (Exhibits B1F–B33F). Imaging of the upper extremities and hips are consistently normal while imaging of the cervical and lumbar spine usually showed no more than moderate changes, which is consistent with an ability to perform a reduced range of light work activity as opined (e.g. Exhibits B3F/37, 54, 60–65, 72; B4F/137, 139, 141–142, 144, 148, 164–168, 178, 181, 205; B20F/6, 22; B31F/50–51, 58–59, 104–106; B35F/4). Furthermore, while some physical therapy notes reflect a reduction in hip strength, she otherwise presents with adequate strength that was often described as normal by her other specialists (e.g. Exhibits B4F/7, 9–10, 12, 41, 74; B5F/8, 16; B18F/6; B20F/2, 7, 10–11, 14; B23F/2; B25F/3, 11; B28F/214, 242; B31F/104). She also usually presented with intact sensation, a normal ability to transfer from sitting to standing, and normal gait, along with normal heel, toe, and tandem gait, and the rare notations of an antalgic gait reflect that she did not require any assistive devices (e.g. Exhibits B4F/9–10, 41, 74; B5F/8, 16; B14F/7; B18F/6; B14F/7; B20F/7, 10–11; B25F/3, 11, 27; B28F/169, 214, 252). Such findings on physical examinations and objective studies support an ability to perform a reduced range of light work. FVC and FEV1 levels, particularly with bronchodilators, along with the left ventricle ejection fractions reflected on echocardiograms, demonstrate an ability to perform light work activity with the opined environmental limitations to address potential triggers (e.g. Exhibits B11F/74, 80, 83; B19F/12; B31F/145, 158, 152, 160). However, because of updated imaging studies showing slight progression of degenerative changes over the period under review, including rare notations of severe facet arthropathy at L3–4, along with occasional notations of notably reduced strength in the hips, the undersigned limited her to standing and/or walking for up to four hours. Despite her consistently good upper extremity strength, including grip, and her good hand range of motion, manipulative limitations were added to address her right thumb degenerative joint disease and trigger finger (e.g. Exhibits B4F/41; B18F/6).

(R. at 1865–66).

Plaintiff takes issue with ALJ Adkins' analyses of all four reviewers because the ALJ acknowledged that it was unclear if the reviewers gave a "fresh look" at the evidence to the period under review. (Doc. 8 at 8.) But even if ALJ Adkins relied on the state agency reviewers' opinions that were impermissibly formed, that error is harmless. *Linda A.*, 2024 WL 242504, at *9. As mentioned, ALJ Adkins found the reviewers' opinions persuasive because they were supported

14

and consistent with the record—not because they adopted ALJ Kenyon's RFC.  (R. at 1865–67) (citing R. at 90–103, 106–07, 119–20, 122–23) (finding the opinions of Drs. Warren and Tishler were "well explained and generally supported by and consistent with the record")).  And he said the opinions of Drs. Siddiqui and Mutchler were "explained with citations to the record and are generally supported by and consistent with the record."  (R. at 1865 (citing R. at 103–06, 107–09, 121–25)).  As demonstrated above, ALJ Adkins considered a host of clinical examinations of Plaintiff's generally stable mental and physical condition that constitute substantial evidence in support of these findings.  (*See, e.g.*, R. at 1408, 1572, 1578, 1359, 1412, 1473, 1529, 1573, 1601, 2545, 2555, 2564, 2800, 2877, 3053, 538, 540–41, 543, 572, 605, 799, 807, 1360, 1383, 1388, 1391–92).  Thus, the ALJ did not commit "reversible error" as Plaintiff suggests.  (Doc. 8 at 8).

Further, Plaintiff claims that because the ALJ found the opinions unpersuasive in 2020 and now found their opinions persuasive on remand, that the ALJ had a "disingenuous" and "inexplicable" change of tune that is unsupported by substantial evidence.  (Doc. 8 at 8). Apparently forgetting the last two pages of her brief, Plaintiff now would like the Undersigned to find error in the fact that the ALJ gave a "fresh look" at the evidence.  But the Undersigned declines to contravene the rule of law so that Plaintiff may attain a more preferable result.

Plaintiff's contention of error is without merit.

### D.     Evaluation of the X-Ray Evidence

Plaintiff next claims the ALJ erred because he "essentially substituted his interpretation of the medical evidence for that of treating physician Sayyah Ajlouni, M.D." by interpreting a March 2020 lumbar x-ray that the state agency physicians did not consider.  (Doc. 8 at 9).  The Undersigned disagrees.

Primary care physician, Dr. Sayyah Ajlouni, M.D. submitted an opinion in 2020 and another in 2024.  In her 2020 opinion, she limited Plaintiff to lifting ten pounds occasionally, lifting

five pounds frequently, and sitting for less than a half an hour in an eight-hour workday. (R. at 1351). The ALJ found this opinion "limitedly persuasive," in relevant part because imaging of Plaintiff's lumbar spine "usually showed no more than moderate changes." (R. at 1871 (citing R. at 1351, 1781)). In 2024, Dr. Ajlouni opined that Plaintiff "was unable to be prompt and regular in attendance, withstand the pressure of meeting productivity and work accuracy without decompensation, demonstrate reliability, or complete a normal workday or work week without interruption from symptoms while performing at a consistent pace without an unreasonable number or length of rest periods." (R. at 1872 (citing R. at 3044–45)). The ALJ found this opinion to be "somewhat persuasive" again in part because of the "moderate changes" reflected in Plaintiff's lumbar spine imaging. (R. at 1872–73 (citing R. at 1781)). Despite Dr. Ajlouni's proposed limitations, the ALJ determined that Plaintiff would be able to "stand and/or walk for at least four hours while performing occasional postural activities." (R. at 1853).

Now, Plaintiff points to a March 2020 x-ray of Plaintiff's lumbar spine. Dr. Ajlouni reviewed this x-ray and said it showed Plaintiff's L4-L5 spondylolisthesis worsened in the time since her last study in 2017. (R. at 1871 (citing R. at 1351, 1781)). Plaintiff makes two arguments about this x-ray. Neither are persuasive.

First, she says that in coming to his RFC determination, the ALJ disregarded Ajlouni's reading of the x-ray and erroneously gave his own interpretation of the "raw medical data." (Doc. 8 at 9). The Undersigned disagrees. An RFC determination is "an administrative finding of fact reserved to the Commissioner." *Tiggelman v. Comm'r of Soc. Sec.*, No. 1:18-CV-1402, 2019 WL 5232812, at *8 (W.D. Mich. Sept. 17, 2019), *report and recommendation adopted*, No. 1:18-CV-1402, 2019 WL 5213716 (W.D. Mich. Oct. 16, 2019). "[T]he ALJ is charged with the responsibility of determining the RFC based on h[is] evaluation of the medical and non-medical

evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "'[T]o require the ALJ to base h[is] RFC on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability.'" *Hunt v. Comm'r of Soc. Sec.*, No. 1:24-CV-01619-BMB, 2025 WL 1303482, at *17 (N.D. Ohio May 6, 2025) (quoting *Rudd*, 531 F. App'x, at 728), *report and recommendation adopted*, No. 1:24-CV-01619, 2025 WL 1456242 (N.D. Ohio May 21, 2025). All told, the ALJ merely needs to evaluate the opinion for supportability and consistency. 20 C.F.R. § 416.920c(b)(2).

Here, the ALJ did not improperly substitute his "own medical judgment" for that of any medical expert beyond his ability by making his RFC determination. *See Tiggelman.*, 2019 WL 5232812, at *8. Instead, he noted that Plaintiff's lumbar x-rays were inconsistent with Dr. Ajlouni's recommendation. (R. at 1871 (citing R. at 1351, 1781)). This analysis is evidence that the ALJ compared the x-ray to Dr. Ajlouni's opinion as the regulations require—not that he read the x-ray for himself. 20 C.F.R. § 416.920c(b)(2). Moreover, in making this analysis, the ALJ did not interpret any raw medical data as Plaintiff suggests. (R. at 1871 (citing R. at 1351, 1781)). The only raw medical data—the x-ray—was read and interpreted by Dr. Ajlouni and a certified physician assistant who gave the same read. (R. at 1387, 1781). And the record indicates the ALJ included explicit reference to these interpretations. (R. at 1850 ("March 2020 lumbar x-rays showed grade 1 spondylolisthesis at L4-5 that had worsened since her 2017 study") (citing R. at 1387); R. at 1871 (citing R. at 1781)). This was all he had to do. *Cf.*, *Rudd*, 531 F. App'x, at 726–27 (6th Cir. 2013) (finding no error where ALJ relied on radiologist's interpretation of x-rays without the further assistance of a medical expert, stating that while the x-rays were raw medical data, the radiologist's report was not).

17

Second, Plaintiff claims the ALJ erred because the ALJ's RFC fell in line with the recommendations of state agency reviewing physicians, who did not review the x-ray. (Doc. 8 at 9). Again, the Undersigned disagrees. Where an ALJ relies on opinions of state agency medical and psychological consultants, the ALJ is not required to obtain an updated medical opinion on the later-submitted evidence "as long as the ALJ considered the later records and accounted for any relevant differences in them." *Molly H. v. Comm'r of Soc. Sec.*, No. 3:24-CV-00181, 2025 WL 2630681, at *12 (S.D. Ohio Sept. 12, 2025); *see also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) ("Even if [the state agency medical consultant's] RFC was completed without knowledge of these [medical] issues, however, the record reflects that the ALJ considered them."). Here, the ALJ considered the x-ray and accounted for any changes in Plaintiff's condition, despite the fact that the x-ray was submitted after the reviewing physicians came to their conclusions. For example, the ALJ referred directly to a physician assistant's appraisal of the x-ray, who gave the same reading that Dr. Ajlouni did. (R. at 1850 ("March 2020 lumbar x-rays showed grade 1 spondylolisthesis at L4-5 that had worsened since her 2017 study, and it continued to show a transitional lumbosacral vertebral body." (citing R. at 1387)). The ALJ then accounted for the physician assistant's interpretation of this worsening condition by noting that Plaintiff refused an injection that may have made her condition better. (*Id.*). The ALJ thus considered the later-submitted x-ray as required. *Molly H.*, 2025 WL 2630681, at *12.

Accordingly, Plaintiff's contention of error is without merit.

### E.      Consistency of Mr. Hegyi's Opinion

Finally, Plaintiff argues the ALJ erred because he failed to evaluate the opinion of physical therapist, Christopher Hegyi, for consistency. (Doc. 8 at 12). Although Plaintiff initially claims that the ALJ failed to evaluate both supportability and consistency, she later abandons the supportability argument and argues only that the ALJ failed to evaluate consistency. (*See* Doc. 8

18

at 12 (recognizing the ALJ evaluated supportability because the ALJ "merely summarized PT Hegyi's opinion and then compared it with Turky's internal performance on PT Hegyi's examination, which only goes to the <u>supportability</u> factor.") (emphasis in original)).  Plaintiff's argument is unavailing.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [her] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.*; *see also* 20 C.F.R. §§ 416.913(a), 416.920c (2017).  The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. § 416.913(a)(1)–(5).  Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (*see* § 416.1400) in your current claim based on their review of the evidence in your case record . . . .

§ 416.913(a)(2), (5).

familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. 20 C.F.R. § 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. 20 C.F.R. § 416.920c(b)(2).

Thus, the role of the ALJ is to articulate how he considered medical opinions and how persuasive he found the medical opinions to be. *Holston v. Saul*, 2021 WL 1877173, at *11. The role of the Court is not to reweigh the evidence, but to make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.* at *14.

The ALJ summarized and evaluated Mr. Hegyi's opinion as follows:

The opinion of Mr. Christopher Hegyi, the physical therapist who performed the functional capacity evaluation, is somewhat persuasive (Exhibit B34F). Mr. Hegyi opined that, based on [Plaintiff]'s performance during her evaluation, she was limited to lifting up to ten pounds, depending on the height she was lifting from, and carrying up to five pounds, but she was unable to do either frequently (Exhibit B34F/15). She was unable to push or pull (Exhibit B34F/15). She was able to constantly sit but was limited to occasional standing and walking (Exhibit B34F/15). She was limited to occasional grasping and reaching overhead with frequent fingering and reaching forward (Exhibit B34F/12, 14). She was limited to no stooping, stair climbing, ladder climbing, kneeling, crouching, or crawling (Exhibit B34F/14). While the opinion of Mr. Hegyi is consistent with her performance during this evaluation, the examiner reported significant concerns

20

with effort as discussed above, and he noted that it was possible that she was able to do more than she rated in some areas (Exhibit B34F/4). Such a statement indicates better functioning than opined, as a residual functional capacity addresses the most a claimant is able to do.

Furthermore, this opinion is only somewhat supported by and consistent with the totality of the medical evidence in the record (Exhibits B1F–B35F). Imaging of the upper extremities and hips are consistently normal while imaging of the cervical and lumbar spine usually showed no more than moderate changes, which does not support the degree of limitation suggested by this opinion (e.g. Exhibits B3F/37, 54, 60–65, 72; B4F/137, 139, 141–142, 144, 148, 164–168, 178, 181, 205; B20F/6, 22; B31F/50–51, 58–59, 104–106; B35F/4). Furthermore, while some physical therapy notes reflect a reduction in hip strength, she otherwise presents with adequate strength that was often described as normal by her other specialists (e.g. Exhibits B4F/7, 9–10, 12, 41, 74; B5F/8, 16; B18F/6; B20F/2, 7, 10–11, 14; B23F/2; B25F/3, 11; B28F/214, 242; B31F/104). She also usually presented with intact sensation, a normal ability to transfer from sitting to standing, and normal gait, along with normal heel, toe, and tandem gait, and the rare notations of an antalgic gait reflect that she did not require any assistive devices (e.g. Exhibits B4F/9–10, 41, 74; B5F/8, 16; B14F/7; B18F/6; B14F/7; B20F/7, 10–11; B25F/3, 11, 27; B28F/169, 214, 252). Her strength findings throughout the record reflect significantly better lifting, pushing, and pulling abilities than opined, and her strength and generally normal gait without ambulatory aids does not support the degree of standing or walking limitations suggested by Mr. Hegyi's report. Imaging studies, range of motion, and strength, including with respect to handgrip, demonstrate that manipulative limitations only apply to the right upper extremity. Those findings also demonstrate an ability to frequently handle with no reaching limitations. While her pain complaints do support some postural limitations, her imaging and strength reflect better postural abilities than suggested by this opinion. Nevertheless, in giving [Plaintiff] the full benefit of the doubt with respect to her subjective complaints, some reduction in standing and walking was adopted, as were postural and manipulative limitations to the extent supported by the totality of the record. Additionally, constant sitting is consistent with the totality of the medical evidence in the record, including her imaging studies discussed above and mostly negative straight leg raising. Therefore, the opinion of Mr. Hegyi is somewhat persuasive.

(R. at 1874–75).

Unlike supportability, which requires the ALJ to compare medical conclusions to the evidence offered by the reporting physician herself, consistency requires the ALJ to compare the report's conclusions to the evidence offered in other sources in the record.  20 CFR 404 § 1520c(c)(2); *see also David W. v. Comm'r of Soc. Sec.*, No. 3:24-CV-00255, 2025 WL 841074,

at *7 (S.D. Ohio Mar. 18, 2025) ("Here, the ALJ clearly evaluated the consistency of Dr. Swedberg's opinion by comparing his findings to other medical evidence and Plaintiff's subjective accounts of his symptoms. That is all the ALJ had to do.").  This is what the ALJ did.

First, the ALJ found that the degree of Dr. Hegyi's proposed walking, standing, postural, and bilateral manipulative limitations were not consistent with imaging of Plaintiff's upper extremities and hips, which were "consistently normal."  (R. at 1865, 1871, 1873, 1874 (citing R. at 485, 489–90, 497, 671–72, 697–98, 2986–88)).  The ALJ also found these limitations inconsistent with imaging of Plaintiff's cervical and lumbar spine, which "usually showed no more than moderate changes."  (R. at 1874 (citing R. at 2932–33, 2940–41, 2987–88, 3077)).  The ALJ also looked to physical therapy notes, which reflected "a reduction in hip strength," but ultimately showed Plaintiff had "adequate strength that was often described as normal by her other specialists."  (*Id.*; *see, e.g.*, R. at 538, 540–41, 543, 572, 605, 799, 807, 1360, 1383, 1388, 1391–92)).  Specifically, Plaintiff demonstrated normal sensation, normal ability to transfer from sitting to standing, normal gait, and normal heel, toe, and tandem gait.  (*Id.* (citing R. at 540–41, 572, 605, 799, 807, 1323, 1388, 1391–92, 2099, 2107, 2123, 2411, 2456, 2494)).  Where the record did show Plaintiff demonstrated an antalgic gait, the ALJ noted this was "rare" and that Plaintiff still did not require the use of assistive devices.  (*Id.*; *see, e.g.*, R. at 2107)).  Comparing the opinion to the record evidence was all the ALJ had to do here.  *David W.*, 2025 WL 841074, at *7.

Then, the ALJ looked to Plaintiff's ability to push and pull.  Mr. Hegyi said Plaintiff was unable to push and pull, but the ALJ found this inconsistent with Plaintiff's "strength findings throughout the record."  (R. at 1874; *see, e.g.*, R. at 2107, 2111, 2115).  According to the ALJ, the record demonstrated Plaintiff had "significantly better lifting, pushing, and pulling abilities than opined."  (*Id.*).  Moreover, the ALJ noted that any "manipulative limitations" reflected in the

22

record, "only apply to the right upper extremity," and that Plaintiff is nevertheless able to "frequently handle with no reaching limitations." (*Id.* (citing R. at 1073, 1086, 1383, 1388, 1391, 1395, 1944, 2139, 2249, 2259, 2266, 2271, 2275, 2309, 2928, 2955, 3047, 3060, 3067)). Again, the ALJ performed a sufficient consistency analysis here. *David W.*, 2025 WL 841074, at *7.

The remainder of the consistency analysis was not entirely unfavorable to Plaintiff either. For example, the ALJ found that Mr. Hegyi's limitation of constant sitting was "consistent with the totality of the medical evidence in the record, including her imaging studies discussed above and mostly negative straight leg raising." (R. at 1875; *see, e.g.*, R. at 1087, 1090, 1092, 1388, 1392, 1398, 1402, 2099, 2103, 2107, 2111, 3077)). All told, the ALJ conducted an analysis of the consistency of Mr. Hegyi's opinion. *David W*, 2025 WL 841074, at *7.

Nevertheless, Plaintiff claims the ALJ failed to evaluate the opinion for consistency because he only compared Mr. Hegyi's opinion to itself and failed to compare the opinion to the record as a whole. (Doc. 8 at 12). But this is not reflective of the ALJ's entire analysis. Plaintiff is correct in asserting that the ALJ analyzed supportability in the paragraph she cites. (*Id.* (citing R. at 1874)). But the ALJ immediately followed that paragraph with a consistency analysis, as summarized above. (R. at 1784–85). In that analysis, the ALJ made extensive citation to particular pieces of the record to bolster his conclusions. (*See, e.g.*, R. at 1874). This is exactly what he was required to do under the regulations. The Undersigned finds no error.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   January 7, 2026                              /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE

24